James F. Woods, Esq.
Annie E. Causey, Esq.
WOODS LONERGAN PLLC
280 Madison Avenue, Suite 300
New York, New York 10016
(212) 684-2500
jwoods@woodslaw.com
acausey@woodslaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DOUGLAS BROWN,<br><br>                              Plaintiff,<br><br>             -against-<br><br>GEORGE STERTSIOS, ANTONIO ZANNIKOS, 263 BEDFORD AVE. LLC, d/b/a MARTHA'S COUNTRY BAKERY, MARTHA'S COUNTRY BAKERY 2 LLC, d/b/a MARTHA'S COUNTRY BAKERY, 41-06 BELL BLVD. BAKERY LLC, d/b/a MARTHA'S COUNTRY BAKERY, 70-30 AUSTIN STREET BAKERY INC., d/b/a MARTHA'S COUNTRY BAKERY, and G.V.S. BAKERY, INC., d/b/a MARTHA'S COUNTRY BAKERY,<br><br>                              Defendants. | Case No. _____<br><br><br>**VERIFIED COMPLAINT**<br><br><br>**Jury Trial Demanded** |

Plaintiff, DOUGLAS BROWN, by and through his undersigned attorneys, as and for his verified complaint against Defendants, GEORGE STERTSIOS, ANTONIO ZANNIKOS ("Individual Defendants"), 263 BEDFORD AVE. LLC, doing business as MARTHA'S COUNTRY BAKERY, MARTHA'S COUNTRY BAKERY 2 LLC, doing business as MARTHA'S COUNTRY BAKERY, 41-06 BELL BLVD. BAKERY LLC, doing business as MARTHA'S COUNTRY BAKERY, 70-30 AUSTIN STREET BAKERY INC., doing business as MARTHA'S COUNTRY BAKERY, and G.V.S. BAKERY, INC.,

doing business as MARTHA'S COUNTRY BAKERY ("Corporate Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an employment action arising under the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq*. ("FLSA") and the New York Labor Law ("NYLL").

2.      Detailed in this complaint, Defendants have continually and knowingly violated basic wage and hour laws in their employment of Plaintiff, beginning in or around August of 2010 and continuing until on or about October 31, 2018, when Defendants retaliated against Plaintiff's complaints concerning Defendants' wage and hour violations and terminated his employment, causing Plaintiff significant damages.

3.      More specifically, on or about October 31, 2018, after months of prolonged complaints to Individual Defendants concerning Plaintiff's extraordinary working hours and insufficient overtime compensation, Defendants directed a mid-level store manager to advise Plaintiff that his employment was terminated and that if Plaintiff came to the premises of Defendant 263 Bedford Ave. LLC, Defendants would contact the police.

4.      Based upon information and belief, Defendants fired Plaintiff from continued employment to retaliate against Plaintiff for pursuing his legal rights arising under the FLSA and NYLL, as Plaintiff advised Defendants on October 30, 2018 that he retained legal counsel to pursue their violations of Plaintiff's employment protections.

5.      Based upon the indefensibly intentional and willful character of Defendants' violations, including Defendants' pattern and practice of creating sham records for the purpose of evading labor laws, knowingly and willfully violating governing wage and hour law, and attempting to retaliate against Plaintiff for pursuing his legal rights under the labor

law, Plaintiff seeks liquidated damages on all sums found to be due and owing to him (overtime, spread of hours premium, *etc*.), from six (6) years prior to the date of the commencement of this action to present, including: unpaid overtime compensation, (ii) unpaid spread of hours premium, (iii) statutory penalties, (iv) liquidated damages, and (v) attorney's fees and costs, pursuant to the FLSA and NYLL.

6.      Related to the wage controversy, this action also alleges: (a) that Corporate Defendants, 263 Bedford Ave. LLC and Martha's Country Bakery 2 LLC (the "Brooklyn Bakeries"), by and through the Individual Defendants, perpetrated a fraud on Plaintiff in connection with the offering of a minority interest in the Brooklyn Bakeries; and (b) that Defendants have been unjustly enriched and have and continue to misappropriate Plaintiff's trade secrets by their commercial utilization of Plaintiff's trade-secreted recipes without compensation or permission.

7.      Plaintiff, the creator and curator of dozens of commercially valuable recipes, including cakes, pies, and assorted pastries, all of which were developed and documented prior to the Defendant's employment of Plaintiff and Defendants' appropriation thereof, alleges that Defendants deliberately availed themselves of Plaintiff's valuable intellectual property in a most insidious manner, by a combination of false promises to the Plaintiff of future profits and ownership in a franchise and leveraging their employment of Plaintiff as a baker to gradually draw from Plaintiff his intellectual property without compensation.

8.      Defendants collected windfalls of revenue as a direct and proximate result of their utilization of Plaintiff's intellectual property, bu have never adequately compensated Plaintiff doe the commercial use of his intellectual property.

9.      Due to Defendants' status quo-changing retaliatory termination of Plaintiff

on October 31, 2018, on November 2, 2018, Plaintiff issued a formal cease and desist notice to Defendants concerning their use of Plaintiff's intellectual property, directing Defendants to immediately cease and desist from all further commercial use or exploitation of unauthorized products manufactured pursuant to Plaintiff's intellectual property, and to confirm in writing within three (3) days that Defendants have done so, and have caused all employees, officers, directors, affiliates, and other agents of Defendants to do so.

10.     To date, Defendants have refused to cease and desist and continue in the commercial use or exploitation of unauthorized products manufactured pursuant to Plaintiff's intellectual property.

11.     Plaintiff seeks an award of damages against Defendants on the basis that the enrichment Defendants gained by their commercial utilization and appropriation of Plaintiff's intellectual property, under unconscionable circumstances detailed in this complaint, was at all times unjust and supports an award of damages to Plaintiff in an amount to be determined at trial of the enrichment unjustly received by Defendants as a direct and proximate result of their commercial utilization appropriation of Plaintiff's intellectual property from in or around November 1, 2012 to date.

12.     Plaintiff seeks an award of damages against Defendants in an amount to be determined at trial sounding in trade secret misappropriation from the earliest statutory period applicable and continuing to date, due to Defendants' misappropriation of Plaintiff's above-referenced trade-secreted intellectual property.  Plaintiff also seeks preliminary and permanent injunctive relief against Defendants enjoining them from continuing to misappropriate Plaintiff's trade secrets.

13.     Plaintiff further seeks the rescission of his three (3) percent membership

interest spread across the Corporate Defendant Brooklyn Bakeries on the basis that Plaintiff purchased his interests therein based upon intentional misstatements of material fact purposefully designed to mislead Plaintiff and to induce Plaintiff to tender approximately $125,000.00 as consideration therefor, financed partially through a purported loan with Corporate Defendant 263 Bedford Ave. LLC and/or Martha's Country Bakery 2 LLC.

14.    To put Plaintiff back in his original position prior to the accomplishment of Defendants' fraud, in addition to the acquisition price paid to date for the membership interest, Plaintiff further demands the return of the monies paid in connection with the purported loan from Corporate Defendant 263 Bedford Ave. LLC and/or Martha's Country Bakery 2 LLC to Plaintiff, together with any and all assessments (or capital calls) on the membership interest.

15.    Although a baking prodigy, Plaintiff is wholly inexperienced and largely illiterate as to sophisticated business transactions, and has only a high school education, which he earned in 1987 in Jamaica.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as such claims that are so related to the claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

17.    Venue is proper in the Eastern District pursuant to 28 U.S.C. § 1391(b), as all Defendants are residents of New York and at least two Defendants, Corporate Defendant 263 BEDFORD AVE. LLC, doing business as MARTHA'S COUNTRY BAKERY, and

Corporate Defendant MARTHA'S COUNTRY BAKERY 2 LLC, doing business as MARTHA'S COUNTRY BAKERY, each are residents of and have their principal places of business in this District.   Moreover, a substantial part of the events or omissions giving rise to the calms herein occurred in this District.

## PARTIES

18.     Plaintiff DOUGLAS BROWN is a natural person residing in the City and State of New York, Bronx County ("Brown").

19.     Defendant GEORGE STERTSIOS is a natural person residing in the City and State of New York, is a director, officer or 20%-or-more-owner, of one or more of the Corporate Defendants and exercises dominion and control over Corporate Defendants ("Stertsios").

20.     Defendant ANTONIO ZANNIKOS is a natural person residing in the City and State of New York, is a director, officer or 20%-or-more-owner, of one or more of the Corporate Defendants and exercises dominion and control over Corporate Defendants ("Zannikos").

21.     Defendant G.V.S. BAKERY, INC., doing business as MARTHA'S COUNTRY BAKERY, is a closed corporation organized and existing under the laws of the State of New York as of on or about March 12, 2004 and continuing to present, with a principal place of business at 36-21 Ditmars Blvd., Astoria, New York 11105 ("GVS" or the "Astoria Bakery").   Defendant Stertsios is the record chief executive officer of GVS.

22.     Defendant 41-06 BELL BLVD. BAKERY LLC, doing business as MARTHA'S COUNTRY BAKERY, is a limited liability company organized and existing under the laws of the State of New York as of on or about September 26, 2008 and continuing

to present, with a principal place of business at 41-06 Bell Blvd., Bayside, New York 11361 ("Bayside" or the "Bayside Bakery").

23.     Defendant 70-30 AUSTIN STREET BAKERY INC., doing business as MARTHA'S COUNTRY BAKERY, is a closed corporation organized and existing under the laws of the State of New York as of on or about February 16, 2007 and continuing to present, with a principal place of business at 70-28 Austin St., Forest Hills, New York 11375 ("Austin" or the "Forest Hills Bakery"). Defendant Stertsios is the record chief executive officer of the Forest Hills Bakery.

24.     Defendant 263 BEDFORD AVE. LLC, doing business as MARTHA'S COUNTRY BAKERY, is a closed corporation organized and existing under the laws of the State of New York as of on or about July 8, 2013 and continuing to present, with a principal place of business at 263 Bedford Avenue, Brooklyn, New York 11211 ("263 Bedford" or "Brooklyn Bakery No. 1").

25.     Defendant MARTHA'S COUNTRY BAKERY 2 LLC, doing business as MARTHA'S COUNTRY BAKERY, is a closed corporation organized and existing under the laws of the State of New York as of on or about December 9, 2015 and continuing to present, with a principal place of business at 175 Bedford Avenue, Brooklyn, New York 11211 ("175 Bedford" or "Brooklyn Bakery No. 2").

## STATEMENT OF FACTS

26.     Corporate Defendants are all for-profit entities organized and existing under the laws of the State of New York.

27.     The Individual Defendants, Stertsios and Zannikos, jointly and severally control and manage the business affairs of Corporate Defendants and are actively engaged

in and responsible for the hiring and firing and regulation of Plaintiff's employment, including Plaintiff's wages and hours of work and scope of work to be performed by Plaintiff.

28.     At all times relevant to this action, the Individual Defendants maintained control, oversight, and direction of the operations of the Martha's Country Bakery facilities in which Plaintiff worked, including the payroll and other employment-related matters.

29.     Corporate Defendants and Individual Defendants functioned as Plaintiff's "employer" as that term is in used in all relevant laws.

30.     At all relevant times, Plaintiff was under constant supervision while on the job by Defendants Stertsios and Zannikos.

31.     Plaintiff is a covered employee within the meaning of the FLSA and NYLL.

32.     By reason of the conduct specifically alleged in this complaint, Defendants have violated the FLSA and NYLL.

33.     *Inter alia*, Defendants willfully failed to: (i) compensate Plaintiff with overtime wages at any time during his employment with Defendants, (ii) compensate Plaintiff with his regular hourly rate in a timely manner over a several month period in 2017, in which Defendants withheld all payment to Plaintiff of his regular hourly rate and his overtime rate, (iii) retain and make available to Plaintiff true and correct records of the dates and hours of Plaintiff's work, and (iv) track Plaintiff's hours and overtime hours in any manner whatsoever, and requiring Plaintiff to sign sham documents in order to receive compensation for his work.

34.     Upon information and belief, Defendants' compensation practices are knowingly and intentionally carried out in order to unlawfully evade the recordkeeping and

reporting requirements of FLSA and the NYLL.

35.     While Plaintiff is unable to state at this time the exact amount owing, he proposes to obtain such information by appropriate and focused discovery proceedings to be taken promptly in this action, and requests that damages or restitution be awarded according to proof thus obtained and presented to the Court, including Plaintiff's independent recollection, but estimated to be not less than six hundred eighty-five thousand, five hundred sixty-four dollars ($685,564.00), inclusive of liquidated damages, exclusive of interest, cost and attorney's fees, and spread of hours premium.

36.     Defendants were aware that FLSA required it to pay Plaintiff an overtime premium of time-and-one-half for all hours worked in excess of 40 per workweek, or, alternatively, 8 hours per work day in any 2-week period, and to maintain true and accurate time records for all hours worked by Plaintiff.

37.     Defendants are liable under FLSA and NYLL for failing to properly compensate Plaintiff in a timely manner for his full and proper wages and benefits.

38.     At all relevant times, it has been Defendants' policy, pattern and/or practice in connection with Plaintiff's employment, to willfully fail to: (i) record all of the time that Plaintiff worked for the benefit of the Defendants, (ii) maintain payroll records as required by FLSA and NYLL, (iii) compensate Plaintiff overtime wages for hours worked in excess of 40 per week, (iv) compensate Plaintiff timely.

39.     Defendants were aware that state and federal law required it to pay Plaintiff an overtime premium for hours worked in excess of 40 per week or, alternatively, 8 hours per day in any given 2-week period.

40.     Defendants' failure to pay Plaintiff overtime wages for their work in excess

of 40 hours per week when such wages became due and owing was willful.

41.     Based upon the forgoing misconduct, Plaintiff is entitled to liquidated damages on all overtime wages and wages paid untimely, from six (6) year prior to the commencement of this action, or from January 2012 to present, whichever is the longer period.

42.     One or both of the Individual Defendants initially employed Plaintiff beginning in or around August 2010 to slice cakes and perform preparatory work for pastries in one or more of their Forest Hills, Astoria, and/or Bayside Bakeries.

43.     Beginning in or around January 2012 and continuing up to and including December 2012, Plaintiff was employed by the Forest Hills, Astoria, and Bayside Bakeries (hereinafter also referred to as the "Queens Bakeries") to bake the cakes and pies and other assorted pastries sold by the Queens Bakeries.

44.     The Queens Bakeries and/or Individual Defendants compensated Plaintiff in 2012 with a flat rate of $900.00 per week regardless of the amount of time Plaintiff actually worked and regardless of whether that amount of time was more than forty (40) hours in any 7-day week, and regardless of which Queens Bakery he worked in.

45.     Plaintiff divided his working time amongst the Queens Bakeries as directed by the Individual Defendants from in or around January 2012 and continuing up to and including December 2012. For purposes of Plaintiff, the Individual Defendants treated the three (3) Queens Bakeries as being a collective unit under which they would direct Plaintiff as needed for the six (6) days he worked on a weekly basis.

46.     Plaintiff consistently worked 12 to 14-hours a day, six (6) days a week, or approximately seventy-eight (78) hours each week. Prior to and during holidays, Plaintiff

worked on average between 13 and 15 hours each day and seven (7) days a week.

47.     Plaintiff's average hourly rate from in or around January 2012 and continuing up to and including December 2012 was approximately $11.54/hour, and Plaintiff's average hourly overtime rate for this period was approximately $17.31/hour.

48.     The Queens Bakeries and/or Individual Defendants did not in 2012 nor at any time thereafter compensate Plaintiff for the approximately 1,981.32 overtime hours earned by Plaintiff in 2012 (38 overtime hours/week multiplied by 52.14 weeks in 2012), rendering approximately $34,297.00 in unpaid overtime wages for 2012, without accounting for the spread of hours premium for each workday that exceeded ten (10) hours, which was every workday.

49.     At no time during 2012 did the Queens Bakeries and/or Individual Defendants ensure that Plaintiff received all required lunch and meal breaks.

50.     Plaintiff typically worked two (2) days each week at each of the Queens Bakeries in 2012, where his average workday began at 3:00 or 4:00 in the afternoon and lasted until 4:00 or 5:00 in the morning, and Plaintiff was not ensured adequate meal and rest breaks.

51.     At no time during 2012 did the Queens Bakeries and/or Individual Defendants track Plaintiff's hours as required by law, nor did they track them by any means whatsoever, nor did they provide any means for Plaintiff to track his hours; however, Plaintiff independently recalls his typical shift of 3:00 or 4:00 p.m. until 4:00 or 5:00 a.m.

52.     At no time during 2012 did the Queens Bakeries and/or Individual Defendants provide Plaintiff with proper wage and hour notices or wage statements as required by NYLL.

11

53.     From in or around January 2013 and continuing up to and including December 2013, Plaintiff continued to be employed by the Queens Bakeries and/or Individual Defendants.

54.     The Queens Bakeries and/or Individual Defendants compensated Plaintiff during 2013 with a flat rate of $900.00 per week regardless of the amount of time Plaintiff actually worked and regardless of whether that amount of time was more than forty (40) hours in any 7-day week.

55.     Plaintiff divided his working time amongst the Queens Bakeries as directed by the Individual Defendants from in or around January 2013 and continuing up to and including December 2013.

56.     Plaintiff consistently worked 12 to 14-hours a day, six (6) days a week, or approximately seventy-eight (78) hours each week.  Prior to and during holidays, Plaintiff worked on average between 13 and 15 hours each day and seven (7) days a week.

57.     Plaintiff's average hourly rate from in or around January 2013 and continuing up to and including December 2013 was approximately $11.54/hour, and Plaintiff's average hourly overtime rate for this period was approximately $17.31/hour.

58.     The Queens Bakeries and/or Individual Defendants did not in 2013 nor at any time thereafter compensate Plaintiff for the approximately 1,981.32 overtime hours earned by Plaintiff in 2013 (38 overtime hours/week multiplied by 52.14 weeks in 2013), rendering approximately $34,297.00 in unpaid overtime wages for 2013, without accounting for the spread of hours premium for each workday that exceeded ten (10) hours, which was every workday.

59.     At no time during 2013 did the Queens Bakeries and/or Individual

Defendants ensure that Plaintiff received all required lunch and meal breaks.

60.     Plaintiff typically worked two (2) days each week at each of the Queens Bakeries in 2013, where his average workday began at 3:00 or 4:00 in the afternoon and lasted until 4:00 or 5:00 in the morning, and Plaintiff was not ensured adequate meal and rest breaks.

61.     At no time during 2013 did the Queens Bakeries and/or Individual Defendants track Plaintiff's hours as required by law, nor did they track them by any means whatsoever, nor did they provide any means for Plaintiff to track his hours; however, Plaintiff independently recalls his typical shift of 3:00 or 4:00 p.m. until 4:00 or 5:00 a.m.

62.     At no time during 2013 did the Queens Bakeries and/or Individual Defendants provide Plaintiff with proper wage and hour notices or wage statements as required by NYLL.

63.     From in or around January 2014 and continuing up to and including December 2014, Plaintiff continued to be employed by the Queens Bakeries and/or Individual Defendants.

64.     The Queens Bakeries and/or Individual Defendants compensated Plaintiff during 2014 with a flat rate of $1,000.00 per week regardless of the amount of time Plaintiff actually worked and regardless of whether that amount of time was more than forty (40) hours in any 7-day week.

65.     Plaintiff divided his working time amongst the Queens Bakeries as directed by the Individual Defendants from in or around January 2014 and continuing up to and including December 2014.

66.     Plaintiff consistently worked 12 to 14-hours a day, six (6) days a week, or

approximately seventy-eight (78) hours each week.  Prior to and during holidays, Plaintiff worked on average between 13 and 15 hours each day; and seven (7) days per week.

67.     Plaintiff's average hourly rate from in or around January 2014 and continuing up to and including December 2014 was approximately $12.82/hour, and Plaintiff's average hourly overtime rate for this period was approximately $19.23/hour.

68.     The Queens Bakeries and/or Individual Defendants did not in 2014 nor at any time thereafter compensate Plaintiff for the approximately 1,981.32 overtime hours earned by Plaintiff in 2014 (38 overtime hours/week multiplied by 52.14 weeks in 2014), rendering approximately $38,101.00 in unpaid overtime wages for 2014, without accounting for the spread of hours premium for each workday that exceeded ten (10) hours, which was every workday.

69.     At no time during 2014 did the Queens Bakeries and/or Individual Defendants ensure that Plaintiff received all required lunch and meal breaks.

70.     Plaintiff typically worked two (2) days each week at each of the Queens Bakeries in 2014, where his average workday began at 3:00 or 4:00 in the afternoon and lasted until 4:00 or 5:00 in the morning, and Plaintiff was not ensured adequate meal and rest breaks.

71.     At no time during 2014 did the Queens Bakeries and/or Individual Defendants track Plaintiff's hours as required by law, nor did they track them by any means whatsoever, nor did they provide any means for Plaintiff to track his hours; however, Plaintiff independently recalls his typical shift of 3:00 or 4:00 p.m. until 4:00 or 5:00 a.m.

72.     At no time during 2014 did the Queens Bakeries and/or Individual Defendants provide Plaintiff with proper wage and hour notices or wage statements as

required by NYLL.   In fact, Defendants failed to provide Plaintiff with any hourly wage statements at all for this period.

73.     From in or around January 2015 and continuing up to and including December 2015, Plaintiff continued to be employed by the Queens Bakeries and/or Individual Defendants.

74.     The Queens Bakeries and/or Individual Defendants compensated Plaintiff in 2015 with a flat rate of $1,500.00 per week regardless of the amount of time Plaintiff actually worked and regardless of whether that amount of time was more than forty (40) hours in any 7-day week.

75.     Plaintiff divided his working time amongst the Queens Bakeries as directed by the Individual Defendants from in or around January 2015 and continuing up to and including December 2015.

76.     Plaintiff consistently worked 12 to 14-hours a day, six (6) days a week, or approximately seventy-eight (78) hours each week. Prior to and during holidays, Plaintiff worked on average between 13 and 15 hours each day; and seven (7) days a week.

77.     Plaintiff's average hourly rate from in or around January 2015 and continuing up to and including December 2015 was approximately $19.23/hour, and Plaintiff's average hourly overtime rate for this period was approximately $28.85/hour.

78.     The Queens Bakeries and/or Individual Defendants did not in 2015 nor at any time thereafter compensate Plaintiff for the approximately 1,981.32 overtime hours earned by Plaintiff in 2015 (38 overtime hours/week multiplied by 52.14 weeks in 2015), rendering approximately $57,161.00 in unpaid overtime wages for 2015, without accounting for the spread of hours premium for each workday that exceeded ten (10) hours, which was every

workday.

79.     At no time during 2015 did the Queens Bakeries and/or Individual Defendants ensure that Plaintiff received all required lunch and meal breaks.

80.     Plaintiff typically worked two (2) days each week at each of the Queens Bakeries in 2015, where his average workday began at 3:00 or 4:00 in the afternoon and lasted until 4:00 or 5:00 in the morning, and Plaintiff was not ensured adequate meal and rest breaks.

81.     At no time during 2015 did the Queens Bakeries and/or Individual Defendants track Plaintiff's hours as required by law, nor did they track them by any means whatsoever, nor did they provide any means for Plaintiff to track his hours; however, Plaintiff independently recalls his typical shift of 3:00 or 4:00 p.m. until 4:00 or 5:00 a.m.

82.     At no time during 2015 did the Queens Bakeries and/or Individual Defendants provide Plaintiff with proper wage and hour notices or wage statements as required by NYLL.

83.     From in or around January 2016 and continuing up to and including December 2016, Plaintiff continued to be employed by the Queens Bakeries and/or Individual Defendants.

84.     The Queens Bakeries and/or Individual Defendants compensated Plaintiff during 2016 with a flat rate of $1,500.00 per week regardless of the amount of time Plaintiff actually worked and regardless of whether that amount of time was more than forty (40) hours in any 7-day week.

85.     Plaintiff divided his working time amongst the Queens Bakeries as directed by the Individual Defendants from in or around January 2016 and continuing up to and

including December 2016.

86.     Plaintiff consistently worked 12 to 14-hours a day, six (6) days a week during this period, or approximately seventy-eight (78) hours each week.  Prior to and during holidays, Plaintiff worked on average between 13 and 15 hours each day; and seven (7) days a week.

87.     Plaintiff's average hourly rate from in or around January 2016 and continuing up to and including December 2016 was approximately $19.23/hour, and Plaintiff's average hourly overtime rate for this period was approximately $28.85/hour.

88.     The Queens Bakeries and/or Individual Defendants did not in 2016 nor at any time thereafter compensate Plaintiff for the approximately 1,981.32 overtime hours earned by Plaintiff in 2016 (38 overtime hours/week multiplied by 52.14 weeks in 2016), rendering approximately $57,161.00 in unpaid overtime wages for 2016, without accounting for the spread of hours premium for each workday that exceeded ten (10) hours, which was every workday.

89.     At no time during 2016 did the Queens Bakeries and/or Individual Defendants ensure that Plaintiff received all required lunch and meal breaks.

90.     Plaintiff typically worked two (2) days each week at each of the Queens Bakeries in 2016, where his average workday began at 3:00 or 4:00 in the afternoon and lasted until 4:00 or 5:00 in the morning, and Plaintiff was not ensured adequate meal and rest breaks.

91.     At no time during 2016 did the Queens Bakeries and/or Individual Defendants track Plaintiff's hours as required by law, nor did they track them by any means whatsoever, nor did they provide any means for Plaintiff to track his hours; however,

Plaintiff independently recalls his typical shift of 3:00 or 4:00 p.m. until 4:00 or 5:00 a.m.

92.     At no time during 2016 did the Queens Bakeries and/or Individual Defendants provide Plaintiff with proper wage and hour notices or wage statements as required by NYLL.

93.     Upon information and belief, Individual Defendant Stertsios is the sole owner of the Astoria Bakery, and directly manages and supervised the operations and employees of the Astoria Bakery, including Plaintiff, and controlled and directed all hours and times and days worked by Plaintiff.

94.     Beginning in or around January 2017 and continuing up to and including December 2017, Plaintiff became primarily employed by two (2) new Martha's Country Bakeries, Corporate Defendant 263 Bedford (*i.e.*, Brooklyn Bakery No. 1) and Corporate Defendant 175 Bedford (*i.e.*, Brooklyn Bakery No. 2) (together, the "Brooklyn Bakeries") to bake the cakes and pies and other assorted pastries sold by Corporate Defendants.

95.     The Brooklyn Bakeries and/or Individual Defendants compensated Plaintiff in 2017 with a flat rate of $1,500.00 per week regardless of the amount of time Plaintiff actually worked and regardless of whether that amount of time was more than forty (40) hours in any 7-day week.

96.     Plaintiff divided his working time amongst the Brooklyn Bakeries as directed by the Individual Defendants from in or around January 2017 and continuing up to and including December 2017.

97.     Plaintiff consistently worked 12 to 14 hours a day, six (6) days a week, or approximately seventy-eight (78) hours each week. During holidays, Plaintiff worked on average between 13 and 15 hours each day.

98.     However, with respect to Corporate Defendant 263 Bedford, the first of the Brooklyn Bakeries to open, Plaintiff consistently worked 12 to 14 hours a day, seven (7) days a week, in consecutive calendar weeks, from January 2017 and continuing up to and including middle May 2017.

99.     In other words, plaintiff worked approximately 1,680 hours over the course of twenty (20) consecutive weeks, from January 2017 to middle May 2017, at the same flat rate of $1,500.00/week.

100.     In middle May 2017, the Individual Defendants advised that the certificate of occupancy for the Brooklyn Bakery No. 1 location had been delayed and Defendant 263 would not open until in or around October 2017.

101.     Defendants did not pay Plaintiff any wages from January 2017 to middle May 2017, waiting until in or around November 2017 to compensate Plaintiff with these back-wages, without interest, and without permission, in violation of the FLSA and NYLL.

102.     Consequently, Plaintiff again commenced to worked 12 to 14 hours a day, seven (7) days a week, consecutively, from middle August 2017 and continuing up to and including October 2017, for purposes of preparing for Defendant 263 Bedford's belated opening.

103.     In other words, Plaintiff worked approximately 1,008 hours over the course twelve (12) consecutive weeks, from middle August 2017 and continuing up to and including October 2017, at the same flat rate of $1,500.00/week.

104.     Plaintiff's average hourly rate from in or around January 2017 and continuing up to and including December 2017 was approximately $16.85/hour, and Plaintiff's average hourly overtime rate for this period was approximately $25.28/hour.

105. The Brooklyn Bakeries and/or Individual Defendants did not in 2017 nor at any time thereafter compensate Plaintiff for the approximately 2,555.86 overtime hours earned by Plaintiff in 2017 (49 average overtime hours/week multiplied by 52.14 weeks in 2017), rendering approximately $64,604.00 in unpaid overtime wages for 2017, without accounting for the spread of hours premium for each workday that exceeded ten (10) hours, which was every workday.

106. At no time during 2017 did the Brooklyn Bakeries and/or Individual Defendants ensure that Plaintiff received all required lunch and meal breaks.

107. Plaintiff typically worked out of Brooklyn Bakery No. 1 in 2017, where his average workday began at 3:00 or 4:00 in the afternoon and lasted until 4:00 or 5:00 in the morning, and Plaintiff was not ensured adequate meal and rest breaks during these times.

108. At no time during 2017 did the Brooklyn Bakeries and/or Individual Defendants track Plaintiff's hours as required by law, nor did they track them by any means whatsoever, nor did they provide any means for Plaintiff to track his hours; however, Plaintiff independently recalls his typical shift of 3:00 or 4:00 p.m. until 4:00 or 5:00 a.m.

109. At no time during 2017 did the Brooklyn Bakeries and/or Individual Defendants provide Plaintiff with proper wage and hour notices or wage statements as required by NYLL and FLSA.

110. The Brooklyn Bakeries and/or Individual Defendants failed to compensate Plaintiff and other employees with any monies whatsoever in 2017 until in or around March 2017, and no interest was paid on Plaintiff's compensation thus wrongfully withheld and/or delayed, for work performed over the first twelve weeks of 2017, when Plaintiff was working 7 days a week in consecutive 7-day workweeks.

111.   Brooklyn Bakery No. 1 is the exclusive supplier of the cakes and pies and other assorted pastries sold from Brooklyn Bakery No. 2's location at 175 Bedford Ave., Brooklyn.

112.   Upon information and belief, Individual Defendants own a collective fifty-one percent (51%) or more of the membership interests in the Brooklyn Bakeries and directly manage and supervise the operations and employees of the Brooklyn Bakeries, including Plaintiff, and each control and direct all hours and times and days worked by Plaintiff.

113.   From in or around January 2018, Plaintiff continued in his employment with the Brooklyn Bakeries where he was employed until his retaliatory termination on or about October 31, 2018, prior to which, he worked primarily out of Brooklyn Bakery No. 1 and assisted as-needed with the other four (4) Martha's Country Bakeries as directed by the Individual Defendants.

114.   The Brooklyn Bakeries and/or Individual Defendants compensated Plaintiff during 2018 with a flat rate of $1,500.00 per week regardless of the amount of time Plaintiff actually worked and regardless of whether that amount of time was more than forty (40) hours in any 7-day week.

115.   From January 2018 until his retaliatory termination in October 2018, Plaintiff spent most of his workday in Brooklyn Bakery No. 1, or as otherwise directed by the Individual Defendants, who occasionally directed Plaintiff to one or more of the other Martha's Country Bakeries to work.

116.   From January 2018 through October 31, 2018, Plaintiff consistently worked 12 to 14-hours a day, six (6) days a week, or approximately seventy-eight (78) hours each week.  Prior to and during holidays, Plaintiff works on average between 13 and 15 hours

21

each day; and seven (7) days per week.

117.    Plaintiff's average hourly rate 2018 was approximately $19.23/hour, and Plaintiff's average hourly overtime rate for this period is approximately $28.85/hour.

118.    The Brooklyn Bakeries and/or Individual Defendants have not in 2018 compensated Plaintiff for the approximately 1,981.32 overtime hours earned by Plaintiff in 2018, rendering approximately $57,161.00 in unpaid overtime wages for 2018, without accounting for the spread of hours premium for each workday that exceeded ten (10) hours, which was every workday.

119.    At no time during 2018 did the Brooklyn Bakeries and/or Individual Defendants ensured that Plaintiff received all required lunch and meal breaks.

120.    At no time during 2018 have the Majority Owners and/or Managing Defendants and/or any other agent of the Brooklyn Bakeries tracked Plaintiff's hours as required by law, nor have they track them by any means whatsoever, nor have they provided any means for Plaintiff to track his hours; however, Plaintiff independently recalls his typical shift of 3:00 or 4:00 p.m. until 4:00 or 5:00 a.m.

121.    At no time during 2018 did the Brooklyn Bakeries and/or Individual Defendants provided Plaintiff with proper wage and hour notices or wage statements as required by NYLL and FLSA.

122.    Due to prior employment litigation against Defendants, Individual Defendants required Plaintiff to sign so-called "salary slips," which purported to indicate the total hours worked by employees, including Plaintiff (the "Sham Timesheets"), even though Plaintiff's hours worked were never tracked or recorded by Defendants in violation of the FLSA and NYLL.

123.     The Individual Defendants told Plaintiff and other employees that Defendants needed them to sign the Sham Timesheets to create a false record otherwise indicating compliance with federal and state labor law.

124.     The Sham Timesheets were and continue to be prefilled by the Individual Defendants and/or subordinate supervisors of Corporate Defendants.

125.     Upon information and belief, the Sham Timesheets are populated with unverified hours and other information entirely fabricated and false in order to serve other purposes and other ends – not to accurately report or track Plaintiff's hours of work.

126.     All of Defendants foregoing alleged violations of the FLSA and NYLL were at all times knowing and intentional, warranting an award of liquidated damages on all sums found to be due and owing Plaintiff.

127.     As previously alleged, beginning in or around January 2012 and continuing up to and including December 2012, Plaintiff was employed by the Queens Bakeries and/or the Individual Defendants to bake the cakes and pies and other assorted pastries sold by the Queens Bakeries.

128.     At no time during 2012 or at any time thereafter while Plaintiff was in the employ of the Queens Bakeries, was creating or designing cake and pie recipes, or conveying cake and pie recipes Plaintiff previously created and designed, to or for the benefit of Defendants, including the Queens Bakeries, a part of Plaintiff's scope of work for which he was employed and compensated as embodied in his hourly rate of pay.

129.     The Queens Bakeries and/or the Individual Defendants employed Plaintiff to bake the cakes and pies sold by the Queens Bakeries with the ingredients and methods developed by the Queens Bakeries, which largely consisted of previously prepared

component parts (*e.g.*, the pie dough utilized was from prepackaged cans of readily available retail pie dough, and most cake batter was from an equally well-known retail seller of box cake mixes).

130.   Shortly after the commencement of Plaintiff's employ, however, Individual Defendants began to realize that Plaintiff was a talented and accomplished artisan of baked goods, and that he possessed a wealth of his own recipes that he had created over many years and decades, all of which are kept confidentially at all times in a locked toolbox.

131.   The Individual Defendants came to this realization after tasting one or more of the baked food products manufactured pursuant to Plaintiff's recipes.

132.   More specifically, in or around August of 2010, Individual Defendant Stertsios told Plaintiff that if Plaintiff could enlarge the product list with a dozen or more pies and puddings, and if he would replace other products that did not sell because they were not very good, that Plaintiff could make "a lot of money" with the Individual Defendants as a partner.

133.   Individual Defendants praised Plaintiff and advised Plaintiff that going forward, he should manufacture these particular products for Corporate Defendants, and that if successful, Plaintiff would make "a lot of money" as a partner with Individual Defendants.

134.   Plaintiff did so, without actually disclosing the trade secrets comprising the end products sold, and the Queens Bakeries' revenue began to increase dramatically; they had lines of customers around their stores, which never happened before, waiting to make purchases, and they could nearly not keep up with the wholesale and retail demands on the products.

135.   Indeed, the Individual Defendants, over the years, systematically provided

praise and false promises of profits to Plaintiff to entice him to use more of his recipes to replace Defendants' inferior products and to enlarge Corporate Defendants' menu with dozens of new items made with Plaintiff's recipes.

136.    In or around 2011 and 2012, Individual Defendant Stertsios told Plaintiff that the Individual Defendants were going to create a Martha's Country Bakery franchise and that Plaintiff would be a significant partner in the franchise and they would "make a lot of money."

137.    The Individual Defendants made these promises of riches from the franchise for several years; all of which were false when made, and none of which were ever implemented.

138.    Approximately three (3) years later, after revenues had increased dramatically, the Individual Defendants advised Plaintiff that they wanted to get an assistant for Plaintiff, purportedly so that Plaintiff would not have "bake in the kitchen,"; this promise like so many others they made, was calculated, deceptive and totally false when made.

139.    Individual Defendants attempted to acquire an "assistant" for Plaintiff so as to slowly appropriate his trade-secreted recipes by improper means.

140.    In response, Plaintiff protested because the Individual Defendants had not shared that "lot of money" they had promised Plaintiff in the past, even though revenues had drastically increased, and Plaintiff was wary that Defendants might be attempting to take his recipes under the auspices of an assistant, and then to renege on their continued proffers that Plaintiff would "make a lot of money" and become a partner with the Individual Defendants.

141.    Nonetheless, Defendants hired an "assistant" initially, but when they requested that Plaintiff disclose certain details concerning Plaintiff's trade-secreted recipe

for brownies, Plaintiff refused, and went to the store himself at that time and made the product himself.

142.    Defendants thus permitted Plaintiff to approve of any assistants who worked with him on any of the products manufactured with Plaintiff's trade secrets since they were and continue to be so commercially valuable.

143.    By December 2016, approximately two-thirds of all baked products sold by the Queens Bakeries reflected the embodiment of Plaintiff's intellectual property.

144.    By December 2016, the revenues for the Queens Bakeries had increased from $12 million annually to more than $20 million annually.

145.    Over the course of his employment, Defendants were able to manipulate Plaintiff into permitting the Queens Bakeries to commercially utilize and appropriate Plaintiff's intellectual property by leveraging the disparate power structure inherent in the parties' employee-employer relationship, so as to secure significantly higher revenue for the Individual Defendants and the Queens Bakeries and deny any consideration or compensation to Plaintiff – the source of that significantly higher revenue – for their own enrichment.

146.    They continued to promise Plaintiff that he would see his fair portion of that revenue in order to keep their unjust enrichment.

147.    The Individual Defendants for several years, in and between 2011 and 2015, repeatedly told Plaintiff of opening a new store location and promised that Plaintiff would be a "partner" and make lots of money.  In furtherance of this charade, they sent Plaintiff to "look" at three (3) different locations for what Individual Defendants described to Plaintiff would be "our" new business. This was a charade because at no time did Individual Defendants ever actually intend to significantly partner with Plaintiff; they simply

discovered that they could prolong their commercial gain by continuing to lure Plaintiff by their false promises.

148.    Under various excuses, instead of making Plaintiff a partner in the lucrative endeavors in the Queens Bakeries, in or around 2015, the Individual Defendants told Plaintiff they wanted to open two new bakeries in Brooklyn, and that they would make good on past revenues and successes in those stores.

149.    Plaintiff, continuing to rely on the Individual Defendants and under economic duress, agreed to go along with their proposal.  Unfortunately, their promises to Plaintiff were false and untrue at all times.

150.    Instead of fairly compensating Plaintiff with a reasonable royalty and/or making him a substantial equity member in the Brooklyn Bakeries, the Individual Defendants made him pay an exorbitant amount of money for a minority interest of three (3) percent in the Brooklyn Bakeries.  The Brooklyn Bakeries even went so far as to finance more than two-thirds of the acquisition cost of the minority interest so as to create further economic reliance on Defendants by Plaintiff in an attempt to create an economically impossible situation for Plaintiff.

151.    Individual Defendants knew that Plaintiff was not a sophisticated person, and had no business acumen, and was wholly relying on the Individual Defendants to deal honestly with Plaintiff at all times in connection with their initial promises to him that he would make "a lot of money" and would be a substantial partner with the Individual defendants in the bakery businesses.

152.    Specifically, in or around April of 2016, in order to protect their continued unjust enrichment without compensating Plaintiff and without satisfactorily resolving the

matter, Individual Defendants planned to issue minority membership interests in the Brooklyn Bakeries to Plaintiff at three (3) percent each in each of the Brooklyn Bakeries (the "Minority Interest").

153.     At the time of their offering to Plaintiff, Individual Defendants knew that Plaintiff was not financially able to afford the acquisition of the Minority Interest; Plaintiff was constantly following-up on his expected and promised windfall from all his labor and recipes, and the Individual Defendants kept stringing him along, since they knew he had no immediately available financial means to leave them.

154.     To induce Plaintiff to purchase the Minority Interest, Individual Defendants advised Plaintiff that if he purchased the Minority Interests, he would receive a total profit of approximately $216,000.00 by on or before July 2018.

155.     The Individual Defendants further sold Plaintiff on the Minority Interest by telling him that his hard-earned money would be invested in the Brooklyn Bakeries and used to further the business interests of those respective entities, and that the profits were certain given past performance with the Queens Bakeries, and that the profits reflected the spread between the legitimate costs of the business and the gross receipts.

156.     The Individual Defendants further lied to Plaintiff as to the documents he was asked to sign before a notary, since Plaintiff is barely literate.  Indeed, when he went to the notary, Plaintiff signed as the lender, acknowledging that the debt in the notes were satisfied, not understanding what a promissory note is, nor the meaning of "satisfied."

157.     Defendants found a prodigious baker who was naive to business interests and who in no way could compete with the Individual Defendants' deceptive intent and business acumen.

158.   Defendants' scheme resulted in the accomplishment of their actual motive –
continued utilization of Plaintiff's intellectual property to manufacture and sell the infringing
products without compensation to Plaintiff.

159.   At no time during the fraud-offering of the Minority Interest was Plaintiff
represented by counsel, nor was Plaintiff ever advised to seek counsel independent from
Defendants' counsel, Sacco & Filas, LLP, creating an impossible conflict of interest for the
attorney, who should have advised Plaintiff to seek independent counsel, if for no other
reason, than to protect any remaining veneer of propriety concerning this otherwise
unconscionable and predatory scheme perpetrated by Defendants resulting in Plaintiff's
acquisition of the Minority Interest.

160.   Indeed, the bogus subscription agreements used in the fraud-offering state
that Plaintiff is an accredited investor, when Defendants and their outside general counsel
Sacco & Filas, LLP, knew Plaintiff lived paycheck-to-paycheck, and that he was utterly
tethered to Defendants for his livelihood.  Indeed, Defendants financed a large portion of the
Minority Interest acquisition for this very reason!

161.   Defendants deliberately misrepresented in their drafting of the subscription
agreements that Plaintiff is an accredited investor to create the false impression that the
Plaintiff was a sophisticated investor and to enable Defendants to evade registration and
exemtion requirements in connection with the fraud-offering.

162.   Plaintiff is not a sophisticated business person, and when the Individual
Defendants told him to sign the instruments in connection with the fraud-offering, they told
him just to sign the papers based on their past representations to him.

163.   In relying on Individual Defendants' misstatements made to him to induce

him to purchase the Minority Interest, Plaintiff did purchase the Minority Interest in or around April 2016.

164.    To date, Plaintiff has received no distributive share from his investment and has been assessed additional capital on the Minority Interest since that time.

165.    Upon information and belief, Individual Defendants secretly funneled the consideration for the Minority Interest to entities they owned or controlled, even though this was not discussed with Plaintiff in the offering.

166.    Upon information and belief, Defendants concealed from Plaintiff the truth about the Brooklyn Bakery Defendants and the Individual Defendants, including the fact that investor money was being routed to other entities controlled by Individual Defendants and to other non-public and illiquid investments, having a disastrous impact on Plaintiff: Plaintiff will never receive a distributive share of profit nor will he receive his capital contribution back.

167.    Upon information and belief, Individual Defendants have and continue to funnel revenues from the Brooklyn Bakeries in order to deny the profit promised to Plaintiff when inducing him to acquire the Minority Interest.

168.    After defrauding Plaintiff into acquiring the Minority Interests, Defendants attempted to resolve the IP matter as planned by offering a negligible amount of compensation to Plaintiff, which they believed Plaintiff would accept considering Plaintiff was now in debt to Defendants, in addition to being their employee, and in addition to having used up his savings to acquire the other portion of the Minority Interest.

169.    Plaintiff rejected Defendants' proposed resolution as unsatisfactory and the parties became at an impasse.

170.    After Defendants' last bad act of wrongfully terminating Plaintiff for complaining about Defendants' FLSA and NYLL violations to the Individual Defendants, Plaintiff issued a written cease and desist notice to Defendants on or about November 2, 2018, requiring Defendants to confirm in writing that Defendants, their employees, officers, directors, affiliates, and other agents had immediately ceased all further commercial use or exploitation of the unauthorized products as manufactured pursuant to Plaintiff's intellectual property.

171.    The notice memorialized that Plaintiff never consented to Defendants' use of Plaintiff's trade-secreted recipes without consideration, nor the sale of the infringing baked items without remuneration.

172.    Defendants sell the following products manufactured pursuant to Plaintiff's recipes from the storefronts in the Brooklyn and Queens Bakeries, and, upon information and belief, to other private-label distributors and/or wholesalers in New York City (hereinafter, the "Infringing Products"):

      a.      Carrot Cake;

      b.      Chocolate Fudge Cake;

      c.      Blue Velvet Cake;

      d.      Lemon Coconut Cake;

      e.      Lava Cake;

      f.      New York Style Cheesecake;

      g.      Strawberry Cheesecake;

      h.      Oreo Cheesecake;

      i.      Marble Cheesecake;

j.      Brownie Cheesecake;

k.      Apple Crumb Cheesecake;

l.      Chocolate Chip Cheesecake;

m.      Mississippi Mud Cheesecake;

n.      Peanut-butter Cheesecake;

o.      Brownies;

p.      Blondies;

q.      Crème Brulee (plus base for all crème brulee pastry

        variations);

r.      Bread Pudding;

s.      Banana Chocolate Chip Bread Pudding;

t.      Rice Pudding;

u.      Apple Bread Pudding;

v.      Triple Berry Pie;

w.      Mississippi Mud Pie;

x.      Classic Apple Pie;

y.      Chocolate Cream Pie;

z.      Blueberry Pie;

aa.     Key Lime Pie;

bb.     Sour Cream Apple Pie;

cc.     Apple Crumb Pie;

dd.     Classic Pecan Pie;

ee.     Apple Blueberry Pie;

ff.    Cherry Pie;

gg.    Lemon Meringue Pie;

hh.    Crusts for all pies;

ii.    Apple Mini Tart;

jj.    Pecan Mini Tart;

kk.    Carrot Cupcake;

ll.    Creams/frosting for all cupcakes;

mm.    Brownie Cake Pop;

nn.    Hazelnut Cake Pop;

oo.    Red Velvet Cake Pop;

pp.    Chocolate Cake Pop;

qq.    Butter Cookie;

rr.    Lace Cookie;

ss.    Rainbow Cookie;

tt.    Rugelach;

uu.    Chocolate Chip Cookie;

vv.    Linzer Tart;

ww.    Ice Box;

xx.    Vegan Pumpkin Pie;

yy.    Vegan Old Fashion Apple Pie;

zz.    Vegan Brownie;

aaa.    Vegan Peanut-butter Cookie;

bbb.    Vegan Cheesecakes (all variety);

ccc. Vegan Lava Cake;

ddd. Vegan Carrot Cake;

eee. Vegan Chocolate Cake; and

fff. Vegan Red Velvet Cake.

173. Defendants' continued unauthorized use of Plaintiff's intellectual property infringes on his exclusive rights therein as the sole owner and creator thereof.

174. The information embodying Plaintiff's recipes, consisting of ingredients, processing and manufacturing techniques, cannot be acquired or duplicated by others except by improper means.

175. At all relevant times, the information embodying Plaintiff's recipes consisting of ingredients, processing and manufacturing techniques, is not information widely known separate and apart from Plaintiff.

176. At all relevant times, the information embodying Plaintiff's recipes as heretofore described, consisting of ingredients, processing and manufacturing techniques, is not information widely known to employees in the Queens and Brooklyn Bakeries, nor to others involved in the business, including the Individual Defendants.

177. At all relevant times, Plaintiff exercised extensive caution and took appropriate measures to guard the secrecy of the information embodying Plaintiff's recipes as heretofore described, consisting of ingredients, processing and manufacturing techniques, by ensuring that any and all such information was communicated solely on a need-to-know basis in connection with training assistant bakers beginning in or around 2016-2017 who were directly involved with the manufacturing of the pies and cakes made pursuant to Plaintiff's recipes.

178.   Plaintiff further guarded the secrecy of the information embodying Plaintiff's recipes as heretofore described, consisting of ingredients, processing and manufacturing techniques, by maintaining them at all times while at the Defendant bakeries in a locked toolbox, and disclosing only portions of each recipe to a particular need-to-know person as required for such person to assist in the manufacturing of the particular product pursuant to Plaintiff's recipe.

179.   These particular need-to-know persons were approved by Plaintiff prior to their employment, and these persons acknowledged that these recipes belong Plaintiff and they would not disclose any of that information to anyone, including the Corporate Defendants.

180.   At all relevant times, the information embodying Plaintiff's recipes, consisting of ingredients, processing and manufacturing techniques, which, when utilized by a skilled baker, results in various baked pies and cakes for commercial distribution, was commercially valuable to Plaintiff, to Defendants, and to Defendants' competitors (*i.e.*, other largescale retail bakeries).

181.   Indeed, certain of Defendants' competitors approached Plaintiff at different times beginning in or around 2015 upon learning that the delicious change in the Martha's Country Bakery pies and cakes was due to Plaintiff's recipes, and these competitors sought to enter into valuable commercial business transactions with Plaintiff.

182.   Plaintiff, a middle-aged Jamaican American, has spent nearly the past thirty (30) years of his life experimenting with and perfecting his cake, pie and other pastry recipes, and the information embodying his recipes as heretofore described, consisting of ingredients, processing and manufacturing techniques, were all substantially created prior to 2010.

183.    At all relevant times prior to Defendants' commercial use and unlawful and/or inequitable appropriation of Plaintiff's intellectual property, the Martha's Country Bakeries used ingredients and methods developed by the Queens Bakeries, which largely consisted of prepackaged products or component parts (*e.g.*, the pie dough utilized was from prepackaged cans of readily available retail pie dough; sauces and gelatins were prepackaged frozen items; most cake batter was directly from premix yellow cake boxes found in any grocery store).

184.    The following persons, also employees of Defendants, received the information embodying some of the Plaintiff's recipes, consisting of ingredients and processing techniques in the manufacture of the Products exclusively on a need-to-know basis: (i) Marcos Herrera, of the Forest Hills Bakery, (ii) Hassan Hassan, of Brooklyn Bakery No. 2, (iii) Azul Balbuena, of the Bayside Bakery, (iv) Paul Fixeo of the Forest Hills Bakery, (v) Andres Garcia, of the Astoria Bakery, and (vi) Efrain Frain, of the Bayside Bakery.

185.    Such persons, at the time Plaintiff disclosed to them on a need-to-know basis the information embodying Plaintiff's recipes, consisting of ingredients and processing techniques in the manufacture of the Products, Plaintiff likewise and as a condition of such disclosure, advised each such person that the information to be disclosed was both commercially valuable and therefore confidential, and that it was proprietary to Plaintiff.

186.    Such persons have consistently and unequivocally continued to confirm to Plaintiff in connection with any disclosed modifications of current IP embodying the Products, and with respect to any IP disclosed for in-development products, that each understands that such information disclosed to them by Plaintiff is proprietary to Plaintiff and not to them or Defendants.

## COUNT I

**FAIR LABOR STANDARDS ACT**
**WILLFUL FAILURE TO PAY OVERTIME WAGES**

187. Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

188. At all relevant times, Defendants engaged in a widespread pattern, policy, and practice of violating FLSA, as detailed above in this complaint.

189. At all relevant times, Plaintiff was engaged in commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

190. The overtime wage provisions of and the regulations made pursuant to FLSA applied to Defendants' employment of Plaintiff.

191. At all relevant times, Defendants were Plaintiff's employer engaged in commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

192. At all relevant times, Plaintiff was an employee within the meaning of 29 U.S.C. §§ 203 and 207(a).

193. At all relevant times, Defendants had a policy and practice of failing to pay overtime compensation at the statutory rate of time and one-half to Plaintiff for their hours worked in excess of forty (40) hours per workweek.

194. Defendants knew of and/or showed a willful disregard for the provisions of FLSA as evidenced by their failure to track Plaintiff's hours and to compensate Plaintiff at the overtime premium of time and one-half for their hours worked in excess of forty (40) hours per week when Defendants knew or should have known such was due, especially given Defendants' past exposure to similar employee grievances.

195. Defendants failed to properly disclose or apprise Plaintiff of his rights under

FLSA.

196.    Due to the intentional, willful and unlawful acts of Defendants, Plaintiff suffered damages in an amount not precisely ascertainable at present of unpaid overtime compensation in an amount to be determined at trial, plus an equal amount as liquidated damages.

197.    Plaintiff is entitled to an award of his reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

198.    Because Defendants' violations of FLSA were willful, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

199.    As a result of Defendants' violations of FLSA, Plaintiff has suffered damages by having been denied his overtime wages in an amount to be determined at trial, and is entitled to recovery of such amount, plus liquidated damages, interest, attorney's fees, costs, and any other compensation pursuant to 29 U.S.C. §§ 201 *et seq.*

## COUNT II
### NEW YORK LABOR LAW
### WILLFUL FAILURE TO PAY OVERTIME WAGES

200.    Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

201.    Defendants engaged in a widespread pattern, policy, and practice of violating NYLL as detailed in this complaint.

202.    At all relevant times, Plaintiff has been an employee and Defendants have been his employer within the meaning of the NYLL.

203.    Plaintiff is a covered person under the NYLL.

204.    Defendants employed Plaintiff as an employer and/or joint employer.

205.    At all relevant times, Plaintiff was to receive an overtime rate of pay at the rate of time and one half as Plaintiff's wages for all hours worked in excess of 40 hours per week.

206.    Defendants violated NYLL § 650 *et seq*. and Department of Labor Regulations, including, *inter alia*, 12 NYCRR 142, by failing to pay to Plaintiff overtime compensation to which he is entitled under NYLL.

207.    Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Plaintiff.

208.    Defendants lack a bona fide good-faith basis with respect to their underpayment of Plaintiff's wages was in compliance with the NYLL.

209.    Defendants' violations of the NYLL as described in this complaint have been willful and intentional.

210.    Due to the foregoing unlawful acts of Defendants, Plaintiff suffered damages in an amount not precisely ascertainable at present of unpaid overtime compensation in an amount to be determined at trial, including spread-of-hour premiums, plus an equal amount as liquidated damages.

211.    Defendant is liable to Plaintiff for attorneys' fees and cost incurred in connection with this action pursuant to the NYLL.

## COUNT III
### NEW YORK LABOR LAW
### WILLFUL FAILURE TO MAKE TIMELY PAYMENT,
### FUNISH WAGE STATEMENTS, TRACK HOURS, ETC.

212.    Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

213.    At all relevant times, Plaintiff was employed by Defendants within the

meaning of NYLL §§ 2 and 651.

214.     At all relevant times with respect to Plaintiff's employment, Defendants were required not only to provide a NYLL § 195(1) notice to Plaintiff at hiring, which they did not do, and on or before February 1 of each subsequent year of Plaintiff's employment, which they did not do.

215.     Such notice, as revised by the Wage Theft Protection Act ("WTPA"), required Defendants to include and thus communicate the following information to Plaintiff: (i) his rate or rates of pay, and the basis thereof (*e.g.*, whether paid by the hour, shift, day, week, salary, piece, commission, or other basis), (ii) his "regular hourly rate and overtime rate of pay" as these terms are used and defined in the labor law and the regulations promulgated thereunder, (iii) any allowances claimed as part of the wage (*e.g.*, tip, meal, or lodging credit), (iv) Plaintiff's regular pay day, (v) the name of Plaintiff's employer(s), (vi) any "doing business as" names used by the employer(s), (vii) the physical address of the employer's/employers' main office or principal place of business, and mailing address if different, and (viii) the telephone number of the employer.

216.     Any employee not provided with a Section 195(1) notice within ten (10) business days of his or her first day of employment may recover in a civil action $50 for each work week that the violations occurred or continue to occur, not to exceed a total of $2,500, together with costs and attorneys' fees.

217.     At all relevant times, Defendants were required to furnish Plaintiff with a statement accompanying every payment of wages pursuant to NYLL § 195(3) that lists Plaintiff's gross wages, deductions, and net wages.  In addition, Defendants were required to correctly include the following information on Plaintiff's wage statements: (i) the dates

of work covered by the payment of wages, (ii) the name of the employee, (iii) the name of the employer, (iv) the address and phone number of the employer, (v) the rate or rates of pay, and the basis thereof, (vi) any allowances claimed, (vii) the "regular hourly rate and overtime rate of pay" as these terms are used and defined in the labor law and the regulations promulgated thereunder, (viii) the number of "regular hours" worked as these terms are used and defined in the labor law and the regulations promulgated thereunder, and (ix) the number of overtime hours worked.

218.   Employers that fail to provide a wage statement containing the required information are subject to civil damages in an action commenced by such an aggrieved employee of $100 for each work week that the violations occurred or continue to occur, not to exceed a total of $2,500, together with costs and attorneys' fees.

219.   Defendants willfully failed to supply initial and annual statements to Plaintiff pursuant to NYLL § 195(1), and also willfully failed to provide Plaintiff with any wage statement whatsoever.

220.   Indeed, Defendants' employees, including Plaintiff, allege that Defendants have and continue to create false records intentionally to evade legal compliance, including potentially entirely fabricated wage statements.

221.   Any wage statement in the possession of Defendants is sham document.

222.   Plaintiff is entitled to statutory damages in an amount not less than $30,000.00 for Defendants' continued willful violations of NYLL § 191.

223.   At all relevant times, Defendants were required to pay Plaintiff's regular wage not less frequently than semi-monthly, on regular pay days designated in advance by Defendants.

224.   As previously alleged, with respect to Corporate Defendant 263 Bedford, the first of the Brooklyn Bakeries to open, Plaintiff consistently worked 12 to 14 hours a day, seven (7) days a week, in consecutive calendar weeks, from January 2017 and continuing up to and including middle May 2017.

225.   Defendants refused to pay Plaintiff his regular wage over these first 21 weeks of 2017, until in or around November 2017, on the feigned basis that Defendants did not have the money to pay Plaintiff at that time, advising that they would pay him when they could.

226.   During this period in 2017, Defendants at all times knew that the NYLL required Defendants to make prompt payment of wages to Plaintiff, not less than semi-monthly.

227.   Defendants' violation of Plaintiff's right to receive his wages during this period in 2017 was willful and intentional.

228.   Due to the willful and intentional nature of Defendants' prolonged violation of Plaintiff's entitlement to receive wages earned in compliance with the labor law during the first 5.5 months of 2017, Plaintiff is entitled to liquidated damages in the same amount of the back-wages ultimately rendered to him in or around November 2017, in an amount to be determined at trial in liquidated damages for Defendant's failure to make timely payments to Plaintiff of his regular wage from January 2017 through middle May 2017.

229.   By reason of the forgoing allegations in this complaint, Defendants are liable to Plaintiff for damages on back-wages untimely paid, unpaid overtime compensation, and benefits and supplements in an amount to be determined at trial, plus an additional amount as liquidated damages equal to one hundred percent (100%) of the total amount found to be

due Plaintiff, plus statutory damages and fines, reasonable attorney's fees under FLSA and/or NYLL § 198(1)(1-a), and prejudgment interest as required under the CPLR.

**COUNT IV**
**RETALIATION IN VIOLATION OF FLSA**

230.   Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

231.   At all relevant times, FLSA (29 U.S.C. § 215(a)(3)) prohibited Defendants from terminating Plaintiff as retaliation for his wage and hour complaints to management, including Individual Defendants.

232.   Individual Defendants terminated Plaintiff's employment in retaliation for Plaintiff's continuing complaints to other employees and to Individual Defendant Stertsios about Defendants' unlawful labor practices, including their failure to pay Plaintiff overtime.

233.   On or about October 30, 2018, Plaintiff advised Defendants that he had retained counsel to pursue his employment rights, and that Plaintiff's counsel would be contacting Defendants' counsel to that end.

234.   In a disgusting turn of events, on or about October 31, 2018, Defendants telephoned Plaintiff (through a mid-level employee) and advised Plaintiff that he was terminated; to scare him, Defendants threatened Plaintiff that if he came to any of the Martha's Country Bakery premises, that they would call the NYPD.

235.   To date, Plaintiff has not received his last wage payment, and has been forbidden to collect same by going to the premises at 263 Bedford Ave. to collect his check, as was the normal course.

236.   Plaintiff experiences sleepless nights and constant worry due to Defendants' unlawful retaliation against him.

237.     Plaintiff seeks punitive damages and damages for emotional distress due to Defendants retaliation against Plaintiff.

## COUNT V
### DERIVIATIVE LIABIILTY PURSUANT TO
### BCL SECTION 630 AND LLC LAW SECTION 611

238.     Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

239.     Pursuant to the Business Corporation Law ("BCL") section 630(a),  the ten largest shareholders of a closed corporation, when the unpaid services were performed in New York, shall jointly and severally be personally liable for all debts, wages or salaries due and owing to any of its employees for services performed by them for such corporation.

240.     Pursuant to the Limited Liability Company Law ("LLC Law") section 609(c), the ten members with the largest percentage ownership interest shall jointly and severally be personally liable for all debts, wages or salaries due and owing to any of its employees for services performed by them for such limited liability company.

241.     At all relevant times, Plaintiff was employed by Defendants within the meaning of the NYLL.

242.     At all relevant times, quite separate and apart from being Plaintiff's employer as that terms in used in the FLSA and NYLL, Majority Owners and/or Managing Defendants Stertsios, Doulias, and Zannikos were and are believed to continue to be, the controlling shareholders, LLC members, or other beneficial owners of Corporate Defendants.

243.     To the extent any portion of Plaintiff's recovery against Defendants is unsatisfied against the Corporate Defendants upon a judgment recovered against it for Plaintiff's services, the Majority Owners and/or Managing Defendants are jointly and

severally liable to Plaintiff for any unsatisfied portion of such a recovery or award or judgment derived from this action.

## COUNT VI
### UNJUST ENRICHMENT

244.   Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

245.   Defendants have been enriched by their access to and utilization of Plaintiff's intellectual property as heretofore described.

246.   Defendants utilization of Plaintiff's intellectual property was at Plaintiff's expense and at all times without reward or remuneration.

247.   At all times relevant to this complaint, Plaintiff expected to be compensated by Defendants for Defendants utilization of Plaintiff's intellectual property embodied in the Products from which they were enriched.

248.   At all times relevant to this complaint, when Plaintiff would earnestly attempt to resolve Defendants continued utilization of Plaintiff's intellectual property without compensation, Defendants would engender excuses to delay final resolution on the terms of compensation for Defendants' past and continued utilization of Plaintiff's intellectual property.

249.   At all times relevant to this action, Defendants acknowledged Plaintiff's intellectual property as a protected asset belonging exclusively to Plaintiff.

250.   At all times relevant to this action, Defendants attempted to and did take advantage of Plaintiff's good-faith expressed toward Defendants whereby Plaintiff relied on Defendants apparent *bona fide* intentions to compensate Plaintiff for their utilization of his intellectual property to manufacture the Products.

251.    At all times relevant to Defendants' utilization of Plaintiff's intellectual property, Plaintiff expected an effective royalty of not less than ten (10) percent on each Product Defendants' sold.

252.    It is against equity and good conscience to permit Defendants to retain the ten (10) percent effective royalty under the circumstances described in this complaint, including the parties' disparate power dynamic arising from the employment relationship, which Defendants leveraged to engender Plaintiff's trust and reliance on their continued acknowledgements to Plaintiff that they would resolve the IP matter and "work it out."

253.    Plaintiff now realizes that Defendants will not "work it out" and that Defendants have only been attempting to stall Plaintiff from taking legal action to protect his intellectual property rights.

254.    Plaintiff seeks an award of damages in an amount to be determined at the trial of this action in an amount not less than the wrongfully retained ten (10) percent effective royalty under the circumstances described in this complaint, plus mandatory interest under New York law.

## COUNT VII
### MISSAPROPRIATION OF TRADE SECRETS

255.    Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

256.    The information comprising Plaintiff's intellectual property as heretofore described is not widely known to anyone outside of Plaintiff.

257.    The information comprising Plaintiff's intellectual property as heretofore described us not generally known within the Martha's Country Bakery syndicates, with the exception of persons to whom Plaintiff disclosed such information or portions thereof on a

need-to-know basis for manufacturing purposes.

258.    At all times relevant to this action, Plaintiff has appreciated the commercial valuableness of the information comprising the intellectual property as heretofore described and has therefore taken reasonable caution to maintain all such information in a confidential manner, disclosing only to such persons as would acknowledge the valuable and confidential nature of the information, and who agreed as a condition to disclosure that they would not attempt to use the information in any manner inconsistent with Plaintiff's exclusive interests therein.

259.    The information comprising Plaintiff's intellectual property as heretofore described cannot be learned except through improper means.

260.    The information comprising Plaintiff's intellectual property as heretofore described is commercially valuable, as evidenced by Defendants' utilization and/or exploitation of the same together with Defendants' increased sales of those products manufactured pursuant to such information.

261.    Plaintiff has expended more than 30 years creating and perfecting the information comprising the intellectual property, and all of the recipes for the Infringing Products (*supra*) were well-developed and settled by Plaintiff prior to Defendants' utilization thereof.

262.    On or about November 2, 2018, after past attempts to resolve Defendants' continued use of Plaintiff's intellectual property without compensation had come to an apparent impasse, Plaintiff issued a written notice to Defendants to cease and desist further use of the intellectual property.

263.    Defendants have refused to comply with the notice, and in flagrant disregard

of Plaintiff's exclusive rights in the intellectual property, continue to instruct their employees with knowledge of Plaintiff's recipes to continue to manufacture the Products pursuant to the information embodying Plaintiff's intellectual property which Plaintiff had disclosed to them on a need-to-know manufacturing basis.

264.    Plaintiff seeks an award of compensatory damages based on an accounting of Defendant's profits generated by the misappropriated trade secrets, or, to the extent Defendants' profits are inadequate compensation, a reasonable royalty based on what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred.

265.    Plaintiff further seeks a permanent injunction forbidding the Defendants, including their employees, from manufacturing the Products heretofore defined as manufactured pursuant to Plaintiff's trade secreted information, and the return of all trade secret documents, notes or memoranda in the possession, custody or control of Defendants, including Defendants' employees, to Plaintiff.

## COUNT VIII
### FRAUD

266.    Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

267.     In connection with Defendants' fraud-offering of the Minority Interest to Plaintiff, Defendants made material misrepresentations of fact with the intent that Plaintiff rely on those misrepresentations to induce Plaintiff to purchase the Minority Interest.

268.    Such material representations included promised returns on Plaintiff's Minority Interest as described in detail above in this complaint, and that Plaintiff's hard-earned money would be invested in the Brooklyn Bakeries and used to further the business

interests of those respective entities, and that the profits were certain given past performance with the Queens Bakeries, and that the profits reflected the spread between the legitimate costs of the business and the gross receipts.

269.    Such representations were misrepresentations at the time Defendants made them to Plaintiff, and Defendants knew that these representations were false at the time they made them to Plaintiff.

270.    Plaintiff utterly relied on these representations when he agreed to purchase the Minority Interest.

271.    But for Defendants' misrepresentations, Plaintiff would not have been induced to acquire the Minority Interest (with convenient partial financing from Defendant Bedford 263) if Plaintiff had known that the foregoing statements were misstatements at the time that Defendants made them, and that they would never be true.

272.    Upon information and belief, all predicate communications and representations concerning the Minority Interest and the fraud-offering were orally communicated to Plaintiff by the Individual Defendants and/or their counsel.

273.    At all relevant times, the Individual Defendants knew that Plaintiff was largely illiterate, and not a sophisticated business person, and could not afford the acquisition costs of the Minority Interest nor the loss of that investment.

274.    Plaintiff was not informed as the nature of the instruments Individual Defendants gave to him and requested that he sign, with knowledge that Plaintiff could not read and understand those instruments.

275.    Plaintiff seeks the rescission of the conveyance of the Minority Interest, the restoration to him of the acquisition cost and purported financing costs in connection with

the purported loan from Defendant 263 Bedford to Plaintiff, together with punitive damages due to the high degree of Defendants' moral culpability, as Plaintiff was fraudulently induced to acquire the Minority Interest.

276.   Alternatively, Plaintiff seeks damages in the acquisition cost and purported financing costs in connection with the purported loan from Defendant 263 Bedford to Plaintiff, together with punitive damages due to the high degree of Defendants' moral culpability, as Plaintiff was advised that the documents and instruments were of another nature, including that one of the instruments was a "note for the lease."

## COUNT IX
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

277.   Plaintiff repeats and realleges the foregoing paragraphs as though fully set forth herein.

278.   The terms and conditions upon which the Minority Interest was conveyed and acquired included an implied covenant of good faith and fair dealing.

279.   Defendants breached this covenant by acting in a manner that effectively destroyed or injured Plaintiff's right to receive the benefit of his acquisition of the Minority Interest, by funneling revenues from the Brooklyn Bakeries to outside interests, which they have done to ensure that the Brooklyn Bakery Defendants are never in a position to issue a distributive share or profit on the Minority Interest, having a disastrous impact Plaintiff.

280.   The Individual Defendants' and Brooklyn Bakery Defendants' intentional prevention of any accumulation of profit constitutes a breach of the implied covenant of good faith and fair dealing.

281.   Plaintiff seeks reliance and/or restitution damages in the amount of the acquisition cost of the Minority Interest, as well as the purported purchase money financing

paid to date in connection therewith.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.      A declaratory judgment that the practices complained of herein are unlawful;

B.      An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

C.      An award of unpaid overtime compensation due under FLSA and NYLL;

D.      An award of unpaid spread of hours due under the NYLL;

E.      An award of statutory penalties as a result of Defendants' failure to comply with the NYLL wage notice and wage statement requirements;

F.      An award of liquidated damages as a result of Defendants' willful failure to pay overtime compensation, pursuant to the NYLL and FLSA;

G.      An award of liquidated damages as a result of Defendants' willful failure to pay spread of hours premium, pursuant to the NYLL;

H.      An award of liquidated damages on wages untimely paid under the NYLL;

I.      An award of prejudgment and postjudgment interest, costs and expenses of this action together with attorney's fees as to the NYLL and FLSA violations;

J.      A judgement of derivative liability as to Defendants Stertsios, Doulias, and Zannikos pursuant to § 630(a) of the BCL and § 609(c) of the LLC Law;

K.      Recession of the conveyance of the Minority Interest and related

transactions, including the partial acquisition financing for the Minority Interest;

L.      An award of reliance and/or restitution damages in the amount of the acquisition cost of the Minority Interest, including the partial acquisition financing for the Minority Interests;

M.      Punitive damages;

N.      An award of damages in an amount to be determined at the trial of this action in an amount not less than the wrongfully retained ten (10) percent effective royalty under the circumstances described in this complaint, plus mandatory interest under New York law, on Plaintiff's unjust enrichment cause of action.

O.      An award of compensatory damages based on an accounting of Defendant's profits generated by the misappropriated trade secrets, or, to the extent Defendants' profits are inadequate compensation, a reasonable royalty based on what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred;

P.      An order temporarily and preliminarily, and a final judgment permanently, restraining and enjoining the misappropriating Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations  and infringement upon Plaintiff's exclusive interest in the IP, by forbidding Defendants, including their employees, from manufacturing the Products heretofore defined as manufactured pursuant to Plaintiff's trade secreted information; or alternatively, from aiding and abetting such future conduct;

Q.      An order directing Defendants' return of all trade secret documents, notes or memoranda in their possession, custody or control, including in the possession of

Defendants' employees, to Plaintiff;

R.      An order directing Defendants to provide a verified written accounting, signed by each of them under penalty of perjury, accounting for all of the revenue received from the sales of the infringing Products, including copies of all sales records for Defendants' sales of the infringing Products for their respective periods of manufacture and distribution; and

S.      Such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.


Dated:  New York, New York
         November 6, 2018

                                        WOODS LONERGAN PLLC

                                        /s/ James F. Woods
                                        _____

                                        James F. Woods, Esq. (JW 3211)
                                        Annie E. Causey, Esq. (AC 5795)
                                        280 Madison Avenue, Suite 300
                                        New York, New York 10016
                                        (212) 684-2500
                                        jwoods@woodslaw.com
                                        acausey@woodslaw.com


                                        *Attorneys for Plaintiff Douglas Brown*

James F. Woods, Esq.
Annie E. Causey, Esq.
WOODS LONERGAN PLLC
280 Madison Avenue, Suite 300
New York, New York 10016
(212) 684-2500
jwoods@woodslaw.com
acausey@woodslaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOUGLAS BROWN, <br><br> Plaintiff, <br><br> -against- <br><br> GEORGE STERTSIOS, ANTONIO ZANNIKOS, 263 BEDFORD AVE. LLC, d/b/a MARTHA'S COUNTRY BAKERY, MARTHA'S COUNTRY BAKERY 2 LLC, d/b/a MARTHA'S COUNTRY BAKERY, 41-06 BELL BLVD. BAKERY LLC, d/b/a MARTHA'S COUNTRY BAKERY, 70-30 AUSTIN STREET BAKERY INC., d/b/a MARTHA'S COUNTRY BAKERY, and G.V.S. BAKERY, INC., d/b/a MARTHA'S COUNTRY BAKERY, <br><br> Defendants. | **Case No. _____** <br><br><br> **VERIFICATION** |

I, Douglas Brown, Plaintiff in the above-captioned action, verify under penalty of perjury that I have had the contents of this complaint read to me, and that to the best of my knowledge and recollection, the matters stated in the complaint are true and correct.

_____
DOUGLAS BROWN